**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI**


JIAXI HU, MENGFANG LI, XIAOYAN
WU, WEI REN, RUIMIN CHEN, JIANLI
DU, JIMEI ZHANG, ZHENPING HAO, JIE
CIU AND GUIYING WANG,                          Case No. 1:15-cv-709-SSB-SKB

        Plaintiffs,

v.

TERRY CHAN, GARY CHAN, MARTIN
ANGIULLI, ANGIULLI, INC., KENTUCKY
REGIONAL CENTER, LLC D/B/A
MIDWEST EB-5 REGIONAL CENTER,
SV ARX, LLC, DANTE BELLA, LLC AND
JEFFREY JACOBS

        Defendants.


## FIRST AMENDED COMPLAINT

Now come Plaintiffs, Jiaxi Hu, Mengfang Li, Xiaoyan Wu, Wei Ren, Ruimin Chen,

Jianli Du, Jimei Zhang, Zhenping Hao, Jie Cui, and Guiying Wang ("Plaintiffs"), and for their

First Amended Complaint ("Complaint") against Defendants, Terry Chan, Gary Chan, Martin

Angiulli, Angiulli, Inc., Kentucky Regional Center d/b/a Midwest EB-5 Regional Center, SV

ARX, LLC, Dante Bella, LLC, and Jeffrey Jacobs (collectively "Defendants") state as follows:

## THE PARTIES

1.      Plaintiffs are citizens and residents of the People's Republic of China and limited partners in KRC Fund I LP (the "Fund"). The Fund is an Ohio limited partnership with its principal place of business located in Cincinnati, Hamilton County, Ohio.

2.      The Fund was purportedly organized for the purpose of raising funds from the solicitation of foreign investors to invest in a mixed-use real estate project (the "Project") in the Short Vine entertainment district in Cincinnati, Ohio.

3.      Defendant the Kentucky Regional Center, LLC d/b/a Midwest EB-5 Regional Center ("KRC") is a Kentucky limited liability company with its principal place of business located in Cincinnati, Hamilton County, Ohio.  KRC is the former general partner of the Fund. KRC was removed by the Fund's Limited Partners on July 15, 2015, and replaced by KRC Fund I Management, LLC, due to numerous acts of malfeasance.

4.      Defendant Terry Chan is a resident of Hamilton County, Ohio, and former principal of KRC.

5.      Defendant Gary Chan is a resident of Hamilton County, Ohio and former principal of KRC.

6.      Defendant Martin Angiulli ("Angiulli") is a principal of KRC and principal of defendant SV ARX LLC ("SV ARX").  Angiulli is also the owner of defendant Dante Bella, LLC ("Dante") and Angiulli, Inc. ("A-Inc.").  Angiulli resides in Hamilton County, Ohio.

7.      Dante is an Ohio limited liability company based in Hamilton County, Ohio. Dante is the entity that Angiulli organized to acquire KRC from the Chans.

2

8.      A-Inc. is an Ohio corporation owned and operated by Angiulli that holds the real estate that was supposed to be acquired  with Plaintiffs' EB-5 investment funds for the Project (as defined below), but never was.

9.      SV ARX is an Ohio limited liability company with its principal place of business in Hamilton County, Ohio.  SV ARX is the developer of the EB-5 Project at issue in this action.

10.      A-Inc., SV ARX, and Dante are all alter egos of Angiulli, completely dominated and controlled by him such that they have no separate mind, will or existence of their own.

11.      Defendant Jeffrey Jacobs ("Jacobs") is a principal of defendant SV ARX.  Jacobs resides in Hamilton County, Ohio.  Jacobs is the project manager for the Project at issue in this action.

## NATURE OF THE ACTION

12.      This is an action that Plaintiffs assert against Defendants for breach of contract, unjust enrichment/quantum meruit, gross negligence, breach of fiduciary duty, conversion, fraud, conspiracy, piercing the corporate veil, and punitive damages, for the Defendants' unlawful actions, which include gross mismanagement, embezzlement and self-dealing of Fund assets.

13.      Defendants have also violated the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), because they procured Plaintiffs' investments by fraud, misrepresentation,  and deception.

## JURISDICTION AND VENUE

14. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the Plaintiffs and the Defendants, and the amount in controversy exceeds the value of $75,000, exclusive of interest and costs.

15. Pursuant to 28 U.S.C. § 1391, venue is proper in this Court, because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because Defendants are subject to personal jurisdiction in this District.

## BACKGROUND FACTS

16. Plaintiffs re-state paragraphs 1- 15 as if fully rewritten.

17. Defendants lured Plaintiffs into investing in the Fund as part of the EB-5 Visa Program administered by the U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services ("USCIS").

18. In 1990, Congress established the EB-5 Program in order to bring new investment capital into the United States and create new jobs for U.S. workers.

19. Under the EB-5 Program, immigrants who invest their capital in job-creating business enterprises in the U.S. receive "conditional" permanent resident status in the U.S. for two (2) years after their I-526 application is approved. If, after the two-year period, the immigrants satisfy the EB-5 Program conditions and other Program criteria, USCIS removes the conditions and the immigrant investors become lawful permanent residents. In other words, the immigrant investors obtain their "green cards."

20. In 1993, Congress enacted the "Immigrant Investor Pilot Program" in order to attract immigrant investment in a range of commercial development opportunities through the use of "regional centers." In 2012, Congress eliminated the "pilot" term from the Immigrant

Investor Program and re-authorized use of the regional center investment model through September 2015.

21.     In essence, the EB-5 Program has three key components: (a) immigrant investment of capital; (b) in a new commercial enterprise; and (c) that creates jobs.

22.     To avail oneself of the EB-5 Program, the immigrant investor must invest at least $1,000,000 of capital in new commercial enterprise that creates at least 10 jobs, unless the immigrant invests his or her capital in what is called a "targeted employment area." In that case, the immigrant must invest $500,000.

23.     The regional center model is not required in order for an immigrant investor to obtain a permanent resident visa through the EB-5 Program. That is, an investor may make a "direct" investment into a new commercial enterprise that creates 10 jobs. However, through the use of the regional center model, the immigrant may invest his capital and can rely on "indirect" job creation, which involves jobs that are held outside of the new commercial enterprise but nonetheless counted as if they are in the commercial enterprise.

24.     Defendants used the EB-5 Program to lure Plaintiffs into collectively investing $5,000,000 in a purported redevelopment project in the Short Vine District in Cincinnati, Ohio, under the regional center model.  As will be discussed more fully below, Plaintiffs have nothing to show for the $500,000 each of them invested.  The Project remains in the infancy stage after several years, the Plaintiffs' money has been improperly spent, and their visa applications have been revoked and/or denied.

25.     On April 29, 2010, USCIS designated KRC as a Regional Center pursuant to the EB-5 Program, which authorized the Regional Center to manage and sponsor EB-5 immigrant investor funds.

26.     KRC had originally been organized to develop and promote the Manhattan Harbor Project, a concept Terry and Gary Chan (the "Chans") came up with to develop riverfront area in Dayton, Kentucky.  However, the Manhattan Harbor Project never amounted to anything.

27.     After the failure of the Manhattan Harbor Project, the Chans came up with a new idea that involved redevelopment of the Short Vine area in Cincinnati, Ohio.  Their idea was to solicit foreign investors seeking permanent residency status in the United States under the EB-5 visa program.

28.     The Chans did not have the financial wherewithal to fund the redevelopment project themselves, so they approached Angiulli, a fellow Pittsburgh native, and the owner and operator of Martino's restaurant on Short Vine Street in Cincinnati.  In addition to being a fellow Pittsburgh native, Angiulli was also the father-in-law of Terry Chan.

29.     Together, the Chans and Angiulli conspired to come up with a plan to line their own pockets at the expense of foreign investors under the guise that they would be redeveloping the 2600 block of Short Vine Street using an investment fund consisting of EB-5 investments from Chinese citizens.

30.     The Chans formed the Fund on or about October 16, 2010, in Cincinnati, Ohio, which is an Ohio limited partnership that KRC managed and utilized to collect the EB-5 investments.

31.     The Fund was supposed to be a real estate development project (the "Project") that involved the acquisition, renovation, and management of mixed use retail, restaurants, and office development in the east and west blocks of 2600 Short Vine Street in the City of Cincinnati, Hamilton County, Ohio (properties that are, for the most part, owned and controlled by Angiulli and A-Inc.).

6

32.     The Fund sought to raise $23 million of EB-5 investment funds from 46 immigrant investors to finance the Project. The investors' funds were invested with the Fund and then lent by the Fund to the project developer, SV ARX to finance the job-creating activities in the Project. The total budget of the Project was $29 million.

33.     In late 2010, the Chans, Angiulli and Jacobs began seeking EB-5 investors in China in order to raise funds for the Project.

34.     Gary Chan spent approximately six (6) months in China in 2011 making presentations to potential investors in China. The presentations were organized through Chinese immigration consultants who were hired by the potential investors looking to gain permanent residency and citizenship in the United States.  Defendants Jacobs and Angiulli participated in the planning and attended many of these marketing meetings.

35.     As part of the presentations made, the Chans promised Plaintiffs and other potential investors that the Short Vine Project was the "first project to be guaranteed by government funds."  That is, the Chans explained to Plaintiffs and their immigration consultants represented that if the investors invested in the Project and it failed, that there is law in Ohio that would guarantee the return of their investment through the Ohio government.  In actuality, however, this "law" was nothing more than a bill that was proposed, but never enacted into law. However, the Chans, through the promise of this alleged government guarantee, lead Plaintiffs to believe that their investment was safe in the event the Project failed.

36.     Defendants Angiulli and Jacobs were aware of these misrepresentations to Plaintiffs and actively conspired with the Chans to promote this false information to Plaintiffs in order to fraudulently induce Plaintiffs to invest in the Project.

37.     The Chans also told Plaintiffs that the Project would also receive funding through bank loans and tax credit financing.  The reality was that the Defendants had no alternative financing for the Project; the only funding source was EB-5 investment dollars.

38.     On or about September 15, 2010, the Fund issued a Private Placement Memorandum on behalf of the Fund which offered "eligible investors up to 40 units of limited partnership interests (the "Units") for $500,000 per Unit, plus an additional $45,000 administration fee per Unit, which fee will be paid by the Fund to the Fund's general partner." At that time, the general partner of the Fund was KRC.  The PPM was later amended on November 15, 2010 (the "PPM"), and was the PPM that was incorporated into the subscription agreements signed by the first nine Plaintiffs.  A copy of the PPM is attached here to as Exhibit A.

39.     Under the PPM:

> Pending USCIS's decision on the prospective investor's I-526 Petition, the subscription payment will be held in an escrow account.  If the USCIS approves the prospective investor's I-526 Petition, the Fund will close on the prospective investor's subscription agreement, subject to the general discretion of the GP to reject subscriptions.  The subscription payment will then be applied as the prospective investor's capital contribution, and the subscription payment in the escrow account will be released to the Fund for the Fund's use consistent with the then applicable EB-5 Program Requirements.  If the USCIS denies the prospective investor's I-526 Petition, the subscription payment will be released from the escrow account and returned to the prospective investor, who will be released from his or her obligation to purchase the Unit.

40.     On July 19, 2011, plaintiff Jianli Du entered into a Subscription Agreement offering to purchase one Unit in the Fund for $500,000, plus an additional $45,000 administration fee.  A copy of Mr. Du's Subscription Agreement is attached hereto as Exhibit B. Mr. Du funded his investment in the Fund on December 12, 2011.  Under the PPM, incorporated

into the Subscription Agreement, Mr. Du's investment proceeds were to be held in an escrow account and not disbursed by MERC or its principals, the Chans, until after USCIS approved Mr. Du's I-526 application.

41.     On July 24, 2011, plaintiff Ruimin Chen entered into a Subscription Agreement offering to purchase one Unit in the Fund for $500,000, plus an additional $45,000 administration fee.  A copy of Mr. Chen's Subscription Agreement is attached hereto as Exhibit C.  Mr. Chen funded his investment in the Fund on November 25, 2011.  Under the PPM, incorporated into the Subscription Agreement, Mr. Chen's investment proceeds were to be held in an escrow account and not disbursed by MERC or its principals, the Chans, until after USCIS approved Mr. Chan's I-526 application.

42.     On July 25, 2011, plaintiff Wei Ren entered into a Subscription Agreement offering to purchase one Unit in the Fund for $500,000, plus an additional $45,000 administration fee.  A copy of Mr. Ren's Subscription Agreement is attached hereto as Exhibit D.  Mr. Ren funded his investment in the Fund on November 21, 2011.  Under the PPM, incorporated into the Subscription Agreement, Mr. Ren's investment proceeds were to be held in an escrow account and not disbursed by MERC or its principals, the Chans, until after USCIS approved Mr. Ren's I-526 application.

43.     On August 31, 2011, plaintiff Jiaxi Hu entered into a Subscription Agreement offering to purchase one Unit in the Fund for $500,000, plus an additional $45,000 administration fee.  A copy of Mr. Hu's Subscription Agreement is attached hereto as Exhibit E. Mr. Hu funded his investment in the Fund on October 6, 2011.  Under the PPM, incorporated into the Subscription Agreement, Mr. Hu's investment proceeds were to be held in an escrow

account and not disbursed by MERC or its principals, the Chans, until after USCIS approved Mr. Hu's I-526 application.

44.     On October 20, 2011, plaintiff Xiaoyan Wu entered into a Subscription Agreement offering to purchase one Unit in the Fund for $500,000, plus an additional $45,000 administration fee.  A copy of Ms. Wu's Subscription Agreement is attached hereto as Exhibit F. Ms. Wu funded her investment in the Fund on November 3, 2011.  Under the PPM, incorporated into the Subscription Agreement, Ms. Wu's investment proceeds were to be held in an escrow account and not disbursed by MERC or its principals, the Chans, until after USCIS approved Ms. Wu's I-526 application.

45.     On October 26, 2011, plaintiff Mengfang Li entered into a Subscription Agreement offering to purchase one Unit in the Fund for $500,000, plus an additional $45,000 administration fee.  Mr. Li funded his investment in the Fund on November 3, 2011.  A copy of Mr. Li's Subscription Agreement is attached hereto as Exhibit G.  Under the PPM, incorporated into the Subscription Agreement, Mr. Li's investment proceeds were to be held in an escrow account and not disbursed by MERC or its principals, the Chans, until after USCIS approved Mr. Li's I-526 application.

46.     On December 6, 2011, plaintiff Jimei Zhang entered into a Subscription Agreement offering to purchase one Unit in the Fund for $500,000, plus an additional $45,000 administration fee.  A copy of Ms. Zhang's Subscription Agreement is attached hereto as Exhibit H.  Ms. Zhang funded her investment in the Fund on December 28, 2011.  Under the PPM, incorporated into the Subscription Agreement, Ms. Zhang's investment proceeds were to be held in an escrow account and not disbursed by MERC or its principals, the Chans, until after USCIS approved Ms. Zhang's I-526 application.

47.     Upon investing their money with KRC, Plaintiffs became Limited Partners in the Fund pursuant to the Limited Partnership Agreement attached hereto as Exhibit I.

48.     However, contrary to the terms of the PPM and their representations to Plaintiffs, and unbeknown to the Plaintiffs, the Chans did not hold the Plaintiffs funds in an escrow account and began spending the money as soon as it was deposited into KRC's operating account in violation of the PPM.

49.     By the time that Plaintiffs' I-526 applications were submitted to USCIS, Defendants had conspired to waste Plaintiffs' investments and use the funds for purposes inconsistent with the PPM and EB-5 Program requirements.

50.      By February 2012, over $4 million of the Plaintiffs' investment funds had been improperly spent by the Defendants, with little to no development done on the block of properties that were supposed to be redeveloped into 9 restaurant concepts to create jobs so that Plaintiffs could get their permanent resident visas approved through USCIS.

51.     For example, Angiulli funneled approximately $700,000 to his family members that provided no meaningful services on the Project.  Family members were hired and paid for sham positions like human resources manager for a company with less than five actual employees.

52.     In addition, $400,000 of Plaintiffs' money was invested in technology companies, like Zipscene and Wearcast, which was inconsistent with the Fund's business plan and KRC's regional center charter.  Those technology companies have not provided any return of capital to the Fund or the Plaintiffs.

53.     Angiulli used several thousands of dollars of the Plaintiffs investments to pay the mortgages and taxes on properties he and/or his alter ego company defendant Angiulli, Inc.

owned and never transferred title to SV ARX.  Angiulli also diverted thousands of investor dollars to pay expenses for his restaurant, Martino's.

54.    On December 21, 2011, Angiulli used investor funds to purchase the Colonade, a parcel of property located at 2718 Vine Street, Cincinnati, Ohio.  The Colonade generated $13,000 in rental income per month.  Yet, despite receiving such rental income from the Colonade, the money went into Angiulli's pocket, rather than into SV ARX for the benefit of the Project.

55.    The Colonade was also used as collateral for a $250,000 line of credit with U.S. Bank.  Angiulli and Terry Chan drew down the $250,000 line of credit and split the proceeds instead of using the proceeds to benefit the Project.  When the Colonade was eventually sold, the line of credit was paid off from the sales proceeds.  This was another $250,000 taken from investor funds.

56.    By September 2012, nine restaurants were to have been developed according to the Project's business plan.  However, at this time, the Project was on put hold and the restaurants were nowhere near completion due to the Defendants' disputes over funding for the Project.  The Project was out of money and Defendants SV ARX, Angiulli and Jacobs were demanding more money from the Chans, KRC and the Fund.  All of the Defendants were accusing each other of misappropriating the Plaintiffs' funds.  The reality was that all of them had misappropriated Plaintiffs' funds and did little to advance the Project forward.

57.    Defendants failed to notify the Plaintiff-Investors of the problems and infighting taking place on the Project.  Instead, Defendants proceeded to solicit further investments from unsuspecting Chinese investors.

58.     Without any disclosure as to the problems that were rampant on the Project, Defendants lured three more investors into investing in the Fund, plaintiffs Zhenping Hao, Jie Cui, and Guiying Wang, who all fell victim to Defendants' scheme.

59.     On July 20, 2012, plaintiff Zhenping Hao entered into a Subscription Agreement offering to purchase one Unit in the Fund for $500,000, plus an additional $45,000 administration fee.  A copy of Mr. Hao's Subscription Agreement is attached hereto as Exhibit J. Mr. Hao funded his investment in the Fund on July 30, 2012. Under the PPM, incorporated into the Subscription Agreement, Mr. Hao's investment proceeds were to be held in an escrow account and not disbursed by MERC or its principals, the Chans, until after USCIS approved Mr. Hao's I-526 application.

60.     On July 21, 2012, plaintiff Jie Cui entered into a Subscription Agreement offering to purchase one Unit in the Fund for $500,000, plus an additional $45,000 administration fee. Ms. Cui funded her investment in the Fund on August 2, 2012.  A copy of Ms. Cui's Subscription Agreement is attached hereto as Exhibit K.  Under the PPM, incorporated into the Subscription Agreement, Ms. Cui's investment proceeds were to be held in an escrow account and not disbursed by MERC or its principals, the Chans, until after USCIS approved Ms. Cui's I-526 application.

61.     On September 5, 2012, plaintiff Guiying Wang entered into a Subscription Agreement offering to purchase one Unit in the Fund for $500,000, plus an additional $45,000 administration fee.  Mr. Wang funded his investment in the Fund on September 26, 2012.  A copy of Mr. Wang's Subscription Agreement is attached hereto as Exhibit L.  By this time, the PPM had been updated to remove the escrow requirement and Defendants were no longer

misleading investors that their investment proceeds were going to be held in escrow pending the approval of their I-526 applications.

62.     The disagreements between the Chans and SV ARX, Angiulli and Jacobs continued, even after three more investors were lured into the Fund.  As a result, on December 21, 2012, SV ARX and Angiulli filed suit against the Fund and the Chans in the Hamilton County, Ohio, Court of Common Pleas, Case Number A1209855, alleging that the Chans improperly diverted nearly $1,000,000 in investment funds that should have gone to SV ARX for the project and that the Fund was refusing to fund the project in violation of the loan documents between the Fund and SV ARX.

63.     On January 17, 2013, the Fund counterclaimed SV ARX, Angiulli and Jacobs alleging breach of the loan documents and conversion of investor funds.

64.      On or about June 11, 2013, Defendants settled the Hamilton County litigation. After settlement of that litigation, Mr. Angiulli purchased KRC from the Chans for $300,000 in January 2014 with investor funds.

65.     At this point, the Project was in shambles and the Plaintiffs' funds were gone.  It was not until October 2013 that Defendants informed the Plaintiffs that the Project was stalled. Prior to that time, there was no mention of the infighting among Defendants or the egregious mismanagement that had occurred with Plaintiffs' funds.

66.     Finally, in January 2014, nine of the Plaintiffs I-526 applications were approved by USCIS, granting them conditional resident status in the United States.  Plaintiff Guiying Wang's I-526 has never been approved.  Under the PPM, applicable to the first nine investors, it was not until this time that the investors' funds should have been released from escrow.  Instead,

unknown to Plaintiffs, their money had already been misappropriated by Defendants in violation of the PPM.

67.     While the first nine investors were pleased that USCIS had approved their I-526 applications, this was the last positive news that they would receive on the Project.

68.     In September 2014, USCIS sent KRC a Notice of Intent to Terminate KRC as a regional center due to the apparent mismanagement of Defendants in the use of EB-5 Funds.  It was apparent to USCIS that KRC no longer promoted economic growth.

69.     On October 20, 2014, KRC responded to the Notice of Intent to Terminate ("NOIT").  However, USCIS did not find KRC's response persuasive, noting that KRC "did not sufficiently address the grounds alleged in the NOIT."  As a result, USCIS terminated KRC as a regional center on February 13, 2015.

70.     In the Notice of Termination, USCIS found, among other things, that Defendants failed to demonstrate any progress on the Project, that Defendants failed to promote economic growth, and that expenditures on the Project to date were inconsistent with the SV ARX business plan.

71.     After terminating KRC as a regional center, USCIS then revoked 9 of the Plaintiffs' I-526 approvals and denied Guiying Wang's I-526 application.  Plaintiffs are appealing USCIS's actions, but their visas are in serious jeopardy.

72.     At this point, Plaintiffs have collectively lost $5,000,000 in the Project and do not have their visas.  The Defendants have placed the Plaintiffs in a disastrous position as a result of numerous acts of malfeasance as discussed above.

## LEGAL CLAIMS AGAINST DEFENDANTS

### First Claim – Breach of Contract

73.     Plaintiffs restate the paragraphs 1 through 72 as if fully rewritten.

74.     The PPM says that Plaintiffs' investment funds will not be touched until after the I-526 applications are approved.

75.     Defendants spent Plaintiffs' investment funds before the I-526 was approved in violation of the PPM.

76.     Defendants also used the administrative fees for purposes inconsistent with the PPM.

77.     Plaintiffs' I-526 applications were either revoked and/or denied.  Under the PPM, Plaintiffs are entitled to a return of the monies that they invested in the Fund.

78.     The Limited Partnership Agreement provides that KRC is "under a fiduciary duty to conduct the affairs of the Partnership in the best interests of the Partnership, including the safekeeping and use of all Partnership funds and assets for the exclusive benefit of the Partnership."

79.     As detailed in the foregoing paragraphs, KRC, the Chans, and the remaining Defendants have failed to conduct themselves in the best interests of the Partnership.  Instead of using Plaintiffs' investment funds to benefit the Partnership, they have used the monies to line their own pockets, pay family members for work that was never performed, pay taxes and expenses on properties that were never acquired by SV ARX, pay expenses on Angiulli's restaurant, pay the Chans for KRC, pay travel expenses, furniture expenses, and other improper expenses.

16

80.     As a direct and proximate result of Defendants' numerous breaches of contract, Plaintiffs have been damaged in an amount in excess of $5,000,000, plus interest, attorney's fees, costs, and other relief as provided by law.

### Second Claim – Breach of Fiduciary Duty

81.     Plaintiffs restate paragraphs 1 through 80 of the Complaint as if fully rewritten.

82.     Defendants owed Plaintiffs a statutory, contractual and common law duty of the utmost good faith and loyalty in the handling of the Project and their investment funds.

83.     Defendants have violated their fiduciary duties to Plaintiff by misappropriating and wasting their investment dollars for their own personal gain and contrary to the best interests of the Project.  Further, Defendants were under a duty to use their best efforts to run the Project in a manner that would result in the creation of jobs and to secure Plaintiffs' EB-5 visas. Defendants have breached this duty to Plaintiffs and their actions have caused USCIS to revoke and/or deny Plaintiffs EB-5 visa applications.

84.     As a direct and proximate result of Defendants' breaches of fiduciary duty, Plaintiffs have been damaged in an amount in excess of $5,000,000, plus interest, attorney's fees, costs, punitive damages and other relief as provided by law.

### Third Claim – Fraud/Fraud  in the Inducement

85.     Plaintiffs restate paragraphs 1 through 84 of the Complaint as if fully rewritten.

86.     As described in the foregoing paragraphs Defendants made material misrepresentations to Plaintiffs that their funds would remain in escrow until the I-526 applications were approved and never had any intention of keeping Plaintiffs' funds in escrow.

87.     Defendants made material representations that they would have other, non-EB-5 funding in the Project, which Defendants knew were false.

17

88.     Defendants made material representations to Plaintiffs that their investments were backed by a government guarantee, the only project of its kind in the United States, which Defendants knew was false.

89.     The representations of Defendants were material, false, misleading, and Plaintiffs reasonably relied upon them to their detriment in making their investments in the Project.

90.     As a direct and proximate result of Defendants' fraud and misrepresentation, Plaintiffs have been damaged in excess of $5,000,000, plus interest, attorney's fees, costs, punitive damages and other relief as provided by law.

91.     In the alternative, due to the material misrepresentations of Defendants upon which Plaintiffs relied in entering into the Subscription Agreement and Limited Partnership Agreement, Defendants are liable to Plaintiffs for rescission of the $545,000 that they each paid to KRC, together with costs, attorney's fees, interest and all other relief as provided by law.

Fourth Claim - Conversion

92.     Plaintiffs restate Paragraphs 1 through 91 of the Complaint as if fully rewritten.

93.     Defendants exercised wrongful dominion and control over Plaintiffs' investment funds and refuse to return them despite demand from Plaintiffs.

94.     As a direct and proximate result of Defendants' conversion of Plaintiffs' funds, Plaintiffs have been damaged in excess of $5,000,000, plus interest, attorney's fees, costs, punitive damages and other relief as provided by law.

Fifth Claim – Unjust Enrichment/Quantum Meruit

95.     Plaintiffs restate Paragraphs 1 through 94 of the Complaint as if fully rewritten.

96.     Plaintiffs conferred a substantial benefit on Defendants by investing $545,000 each into this project.

97.     Defendants have misappropriated and wasted the investment funds as alleged above.

98.     Under the circumstances, it would be unjust to Plaintiffs to allow Defendants to retain the benefits conferred upon them by Plaintiffs.

99.     Plaintiffs have been damaged in excess of $5,000,000, plus interest, attorney's fees, costs, punitive damages and other relief as provided by law.

<u>Sixth Claim – Gross Negligence</u>

100.    Plaintiffs restate Paragraphs 1 through 99 of the Complaint as if fully rewritten.

101.    Defendants owed Plaintiffs a duty of care to properly manage the Project and their investment funds consistent with the offering documents, EB-5 rules and regulations, and the representations made to Plaintiffs as described above.

102.    Defendants have grossly mismanaged the Project, misappropriated Plaintiffs' investment monies for their personal gain, made improper payments to family members, and acted so grossly negligent that USCIS terminated KRC's regional center charter and set in motion the revocation and denial of Plaintiffs' visa applications.

103.    As a direct and proximate result of Defendants' gross negligence, Plaintiffs have been damaged in excess of $5,000,000, plus interest, attorney's fees, costs, punitive damages and other relief as provided by law.

<u>Seventh Claim – Securities Law Violations</u>

104.    Plaintiffs restate Paragraphs 1 through 103 of the Complaint as if fully rewritten.

105.    Defendants have violated the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), because they procure Plaintiffs' investments by fraud, intentional misrepresentation, and deception.

19

106.     As a direct and proximate result of Defendants' conduct, Plaintiffs have been damaged in excess of $5,000,000, plus interest, attorney's fees, costs, punitive damages and other relief as provided by law.

Eighth Claim – Conspiracy

107.     Plaintiffs restate Paragraphs 1 through 106 of the Complaint as if fully rewritten.

108.     Defendants, the Chans, Anguilli, Jacobs, individually and on behalf of the entities they control, KRC and SV ARX, entered into a malicious combination to injure Plaintiffs by fraudulently misrepresenting material facts to Plaintiffs in order to obtain their investment dollars and convert them for their own personal gain rather than for the purpose of securing Plaintiffs EB-5 visas and completing the Project in accordance with its business plan and in order to create at least 10 jobs per plaintiff and return capital to Plaintiffs.

109.     As a direct and proximate result of Defendants' civil conspiracy, Plaintiffs have been damaged in excess of $5,000,000, plus interest, attorney's fees, punitive damages and other relief as provided by law.

Ninth Claim – Piercing the Corporate Veil (Angiulli)

110.     Plaintiffs restate Paragraphs 1 through 109 of the Complaint as if fully rewritten.

111.     Angiulli has complete control over Dante Bella, A-Inc., SV ARX, and KRC such that these entities do not have a separate mind, will or existence of their own.  These entities are a mere façade for the operations of Angiulli.

112.     Those entities in the preceding paragraph have been grossly inadequately capitalized.  For instance, SV ARX was organized with little to no assets to achieve the business purpose for which it was formed and contrary to the representations made to Plaintiffs.  A-Inc.

20

was inadequately capitalized because it did not have the funds to pay its own expenses and instead siphoned thousands of dollars from SV ARX to pay its expenses.

113.    KRC has also been grossly inadequately capitalized such that it had no money at the outset of the Project and is currently insolvent. Like A-Inc., KRC siphoned investor money from SV ARX.

114.    Dante Bella is also nothing more than a shell company formed to shield Angiulli from personal liability and was not adequately capitalized.

115.    Further, Angiulli directed assets of SV ARX to fund the costs of A-Inc., which had no benefit to the Project and only benefitted Angiulli personally. Angiulli also disregarded corporate formalities by using investor money that SV ARX held in order for Dante Bella to acquire KRC from the Chans.

116.    SV ARX has failed to pay the Fund interest payments due under an Amended, Restated and Consolidated Promissory Note executed on or about June 10, 2013, which evidences Angiulli's failure to observe corporate formalities.

117.    Angiulli has controlled SV ARX, KRC, A-Inc., and Dante Bella in such a manner as to commit fraud, breach of fiduciary duty, negligence, conversion and other unlawful acts as set forth in this Complaint.

118.    As a direct and proximate result of Angiulli's actions, this Court should disregard the corporate form and hold Angiulli personally liable to Plaintiffs in an amount in excess of $5,000,000, plus interest, attorney's fees, costs, punitive damages and other relief as provided by law.

<u>Tenth Claim – Piercing the Corporate Veil (the Chans)</u>

21

119.    Plaintiffs restate Paragraphs 1 through 112 of the Complaint as if fully rewritten.

120.    Prior to selling KRC to Anguilli through his alter ego Dante Bella, the Chans were members of KRC.

121.    The Chans failed to observe corporate formalities in the operation of KRC.

122.    The Chans grossly undercapitalized KRC.  KRC had no assets sufficient to conduct its work as a regional center, to promote or to complete the Project.

123.    The Chans diverted investor funds that should have gone to the Project for their own personal gain and inappropriately used investor funds for personal expenditures.

124.    The Chans used KRC to commit fraud, breach of fiduciary duty, conversion, and other unlawful acts complained of in this Complaint against Plaintiffs.

125.    As a direct and proximate result of  the actions of the Chans, this Court should disregard the corporate form and hold the Chans personally liable to Plaintiffs in an amount in excess of $5,000,000, plus interest, attorney's fees, costs, punitive damages and other relief as provided by law.

WHEREFORE, Plaintiffs demand judgment against the Defendants for the following relief:

      a.      Compensatory damages against defendants in an amount in excess of $5,000,000, the exact amount to be proven at trial;

      b.      Forfeiture of fees paid to Defendants in excess of $450,000; and

      c.      Punitive damages in amount at least three times compensatory damages as provided by law; and

      d.      Such other relief as the Court deems just and equitable, including interest, costs and attorney's fees.

Respectfully submitted,


/S/ Christopher D. Cathey
Christopher D. Cathey (0071231)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
250 E. Fifth Street, Suite 2200
Cincinnati, OH 45202-5118
Telephone:  (513) 369-4214
Facsimile:   (513) 421-0991
Email:  ccathey@porterwright.com
Attorney for Plaintiffs


## JURY DEMAND

Under Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury.

Respectfully submitted,


/S/ Christopher D. Cathey
Christopher D. Cathey (0071231)
PORTER, WRIGHT, MORRIS & ARTHUR LLP
250 E. Fifth Street, Suite 2200
Cincinnati, OH 45202-5118
Telephone:  (513) 369-4214
Facsimile:   (513) 421-0991
Email:  ccathey@porterwright.com
Attorney for Plaintiffs


CINCINNATI/230916v.1